UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

```
JOVINO RODRIGUEZ,            )
                            )
          Plaintiff         )
                            )
        v.                  )    Case No. 2:04 cv 381
                            )
JO ANNE B. BARNHART,        )
Commissioner of Social Security,)
                            )
          Defendants        )
```

OPINION AND ORDER

This matter is before the court on the Motion for Summary
Judgment or Remand filed by the plaintiff, Jovino Rodriguez, on
February 4, 2005. For the reasons set forth below, the motion is
**GRANTED.**

Background

The plaintiff, Jovino Rodriguez, initially applied for
Disability and Supplemental Security Income Benefits on December
29, 2001, alleging a disability onset date of January 1, 2001.
(Tr. 119-20) The claim initially was denied on March 25, 2002 and
upon reconsideration September 12, 2002. (Tr. 24-25) Rodriguez
requested a hearing before an Administrative Law Judge ("ALJ") on
October 28, 2002, and a hearing was held before ALJ William J.
Wilkin on June 19, 2003. (Tr. 36, 136). Subsequent to the hearing
in which Rodriguez and vocational expert ("VE") Thomas Grzesik
testified, the ALJ denied Rodriguezís application by written
decision dated July 24, 2003. (Tr. 11, 21) Following a denial of
his request for review by the Appeals Council on July 16, 2004,

Rodriguez filed a complaint in this court on September 28, 2004.
(Tr. 4)

Rodriguez was born in Manatee, Puerto Rico on May 5, 1954,
and was 49 years old at the time of the hearing. (Tr. 139)
Rodriguez is single and lives by himself in a "sleeping room" in
Whiting, Indiana. (Tr. 140-41) He has a GED, a crane operator's
license, and formerly held a license as a barber hairstylist.
(Tr. 67, 142, 143) Rodriguez most recently was employed as a
crane operator for a steel company from January 1999 to January
2001, when the plant closed and he was laid off. (Tr. 54, 62)

On October 1, 1995, Rodriguez fractured his right hand while
working as a final inspector at Arrow Aluminum.  (Tr. 74, 86,
145, 149) Rodriguez is right-handed. (Tr. 140) He was off work
for about six or seven months following the accident, but it is
undisputed that he returned to work for approximately five years
after the injury.  However, the record is unclear what work
Rodriguez performed prior to his crane operating job in 1999.
(Tr. 145-150) His right hand now has several plates and screws
holding the bones together. (Tr. 155) In addition to problems
with his right hand, Rodriguez has had diabetes mellitus for the
last 10 to 11 years. (Tr. 92, 152)

When Rodriguez applied for disability benefits, he had no
medical records and no primary care physician.  (Tr. 63-66)
Thus, the Disability Determination Bureau ("DDB") referred him to
Dr. Kanayo Odeluga for an internal medicine consultative evalua-

tion on February 14, 2002. (Tr. 16) This evaluation is the earliest medical evidence on file.

During his evaluation, Rodriguez described pain interfering with his normal work in the last month; a 20 pound weight loss; fever and night sweats; numerous eye problems including changing vision, halo vision, and vision loss; extensive ear, nose and throat problems such as tinnitus and sinus pain; respiratory problems, cardiovascular discomfort and pain, extensive gastro-intestinal problems; neurological problems including paresthesia in the arms, legs, and face; and interrupted sleep. He also reported polyuria more than eight times a day. (Tr. 89)

Upon examination, however, Dr. Odeluga found that Rodriguez had 20/20 visual acuity in both eyes without correction, normal visual fields, no hearing problems, normal lungs with no wheezing, no heart problems, and normal spinal curvatures without tenderness and with full range of motion. (Tr. 90-91) Rodriguez did not display any difficulty getting on and off the exam table, tandem walking, walking on his toes or heels, squatting, or hopping. (Tr. 91) Dr. Odeluga further found that Rodriguez had normal muscle tone and power throughout his body and normal fine finger manipulation with both hands. (Tr. 91) However, he did note decreased right hand grip strength, decreased light touch sensitivity over the ulna border of Rodriguez's left hand, mild tenderness over the right wrist, and limited range of motion in the right wrist, with a grip strength of 30 (compared to a left grip strength of 80). (Tr. 91-93) Dr. Odeluga's final impression

3

was that Rodriguez had severe hypertension, uncontrolled diabetes mellitus, chronic right wrist pain possibly due to post traumatic osteoarthritis, abnormal right wrist range of motion, right handgrip weakness, and possible right ulna neuropathy, and that Rodriguez smoked and used alcohol. (Tr. 92)

After the initial visit, Rodriguez began seeing Dr. Odeluga on a regular basis. (Tr. 16) On February 15, 2002, Rodriguez told Dr. Odeluga that he had been off his medication, felt dizzy when bending down, and had a weak, tender right hand and wrist. Upon examination, Dr. Odeluga found that Rodriguez had a decreased grip strength of 4/5 in the right wrist with weakness and pain, a glucose level of 344, and uncontrolled diabetes. (Tr. 97) He limited Rodriguez to "light duty" work, prescribed motrin, glucophage, and accupril, and gave Rodriguez samples of the later two medications. (Tr. 97) On February 21, 2002, Dr. Odeluga found that Rodriguez had stabilized his hypertension but still had uncontrolled diabetes and a glucose level of 308. (Tr. 96)

On February 27, 2002, Rodriguez reported no new complaints except his right wrist pain. Dr. Odeluga found a limited range of motion in Rodriguez's right wrist, and he diagnosed hyperten- sion, diabetes mellitus, chronic right wrist pain with an abnor- mal range of motion. (Tr. 95) The same day, Dr. Odeluga com- pleted a Food Stamp and Temporary Assistance form for Rodriguez in which Dr. Odeluga repeated that Rodriguez could perform light work with lifting limited to 10 pounds with the right hand. (Tr. 98) Finally, on March 6, 2002, Rodriguez told Dr.Odeluga that he

4

had been eating at his sister's house and had not been following his recommended diet. Dr. Odeluga encouraged him to follow his diet and to quit smoking. (Tr. 94)

Six months later on September 19, 2002, Rodriguez returned to Dr. Odeluga who found that Rodriguez still had a "high" glucose reading, uncontrolled hypertension and diabetes, and right wrist pain, although with the exception of his index finger, he had a full range of motion in his right hand. (Tr. 116) Dr. Odeluga increased Rodriguez's dose of glucophage and prescribed Celebrex. (Tr. 116) On October 10, 2002, Rodriguez said that he had not been complying with the diabetic diet or with his medication. He said that he slept late but woke up rested, and that he was cutting down on smoking. (Tr. 115) In addition to his complaints regarding his wrist, Rodriguez re-ported right hip pain. Dr. Odeluga once again advised Rodriguez to take his medication as prescribed, recommended a wrist brace, and scheduled x-rays of his right wrist and hip. (Tr. 115)  X-rays taken on October 22, 2002 showed old healed fractures fixed by screws and plates in Rodriguez's wrist and a normal right hip except for small calcifications in the pelvis. (Tr. 103)

On January 8, 2003, Rodriguez reported to Dr. Odeluga that he had "run out of his medication for months." (Tr. 114) On February 19, 2003, he reported having been out of glucophage for two days and that he had been noncompliant with his diet. (Tr. 112) On March 19, 2003, he stated that he had not taken his medication that day, and Dr. Odeluga noted that Rodriguez had

5

poor compliance. (Tr. 111) Finally, on June 16, 2003, Rodriguez told Dr. Odeluga that while away in Ohio, he was not taking his medications. Dr. Odeluga encouraged him to comply with his medications. (Tr. 109)

On June 3, 2003, Dr. Odeluga completed a Functional Capacity Assessment in which he concluded that Rodriguez had a limited lifting/carrying ability in his right hand, could lift less than 20 pounds for up to one-third of an eight hour work day, or less than 10 pounds for up to two-thirds of an eight hour work day due to pain and a limited range of motion in the right wrist. (Tr. 104)  He also found that Rodriguez was limited in pushing/pulling with his right hand due to pain.  (Tr. 105) However, he concluded that Rodriguez did not have any standing, walking, or sitting limitations, environmental limitations, and did not need to rest during the day. (Tr. 105-106)  Dr. Odeluga also stated that Rodriguez could climb, balance, stoop, crouch, kneel, or crawl up to one-third of the day and balance up to two-thirds of the day. He based these limitations on right hip pain. (Tr. 105) As for other work-related activities, Dr. Odeluga stated that Rodriguez could not work in confined spaces where a loss of consciousness or disorientation from hyperglycemia would endanger lives and that he may need a wrist brace.  He opined that the multiple conditions combined together exacerbated the total effect of Rodriguez's limitation. (Tr. 106)

At the ALJ hearing on June 19, 2003, Rodriguez testified that he had full use of his left arm but that he wore a splint

6

because of cramps and pains in his right wrist. (Tr. 155, 157) He
also testified that he could pick up light things with his right
hand but at times lost feeling and dropped the object. (Tr. 156)
He further stated that he could not wind his watch, had pain
running up his arm when he made a fist, and could lift between
10-20 pounds with his right arm, depending on how he felt. (Tr.
155-56) He said that his blood sugar had been in the three to
four hundred range the last year and a half or longer and that
his diabetes caused him to lose consciousness and to urinate 17-
20 times a night. (Tr. 154, 172) He stated that Dr. Odeluga
recently began prescribing Flomax for the polyurina and that a
third party paid for all his medical care. (Tr. 154, 158) He
further testified that he slept only one and one-half to two
hours a night for the last three or four months and did not fall
asleep until about 5:30 a.m. every day. (Tr. 159-60) He said
that Dr. Odeluga had not prescribed any sleep medication but
claimed that the doctor had told him his inability to sleep was
due to his glucose level. (Tr. 160) He also testified that he
took his medication every day. (Tr. 152-53)

Rodriguez testified that he started getting dizzy spells
about six months prior to the hearing. (Tr. 172) He claimed that
he could stand for only 10 to 15 minutes before he had to sit
down or else he becamedizzy. (Tr. 165) In addition, he testified
that he occasionally became dizzy when he bent over. (Tr. 166) He
described the dizzy spells as occurring about once a day for one
to one and one-half minutes and stated that he has never lost his

7

balance or fallen over due to the dizzy spells. (Tr. 172, 174)
According to Rodriguez, his doctor has told him that his dizzi-
ness is due to his diabetes and stated that they had talked about
placing him on insulin. (Tr. 174)

Rodriguez testified to having constant anger. (Tr. 175) He
stated that he got angry three to four time per day and again
claimed that his doctor told him that his anger was due to his
uncontrolled diabetes. (Tr. 175)   He further claimed to have
memory problems. (Tr. 183)

Rodriguez testified that he spent most days at his sisterís
home, as his sleeping room lacked cooking facilities. (Tr. 160)
He did not go grocery shopping because he did not have any place
to put the food, and when he did not eat at his sisters, he ate
cookies or crackers and milk. (Tr. 160-161) Rodriguez testified
that he did not have his driverís license and has not driven for
two years. (Tr. 157) The farthest Rodriguez claimed to walk the
previous few months was four to five blocks, and he stated that
his usual daily walk to his sisterís house was a block and a
half. (Tr. 162) He also said that he did no housework, yard work,
or grass cutting. (Tr. 162) In addition, he testified that he
smoked on average about a half pack of cigarettes per day. (Tr.
163)

Following Rodriguezís testimony, the ALJ posed a number of
hypotheticals to Vocational Expert Thomas Grzesik. (Tr. 184) In
response to the first hypothetical, for a claimant with Rodri-
guez's age and work history who also was limited to a light work

8

function in simple one or two-step jobs with the additional
restrictions of carrying less than 20 pounds for up to one-third
of the work day and less than 10 pounds for two-thirds of the
work day, a limited ability to push or pull with the right hand,
and who could not work around heights or moving machinery but who
had no restrictions on standing, walking, or sitting, VE Grzesik
stated that Rodriguez could perform approximately 3,500 jobs as a
hand packager, 3,500 jobs as a mechanical assembler, and 4,000
jobs as an electrical assembler. (Tr. 187-188) For a second
hypothetical with the same restrictions plus the requirement of
multiple unscheduled bathroom breaks, the VE said that Rodriguez
would be precluded from all work. (Tr. 189-90)  For sedentary
work with the same restrictions, VE Grzesik stated that unsched-
uled access to the bathroom would preclude all jobs again, but
that if frequent urination were not a problem, Rodriguez could
perform 3,000 hand packaging, 3,500 mechanical assembly, and
3,500 electrical assembly jobs. (Tr. 191)  Finally, the VE stated
that if Rodriguez could not sustain eight hours of work, all
employment would be precluded. (Tr. 191-92)

     On cross-examination, Grzesik also stated that daily dizzy
spells would preclude all work but that anger would not impact
Rodriguez's ability to work if it did not result in a work
stoppage. (Tr. 192-93)  Following the VE's testimony, Rodriguez
stated that he is not able to work when angered. (Tr. 193)

     In denying benefits on July 24, 2003, ALJ Wilkin detailed
Dr. Odeluga's treatment of Rodriguez, his testimony at the

hearing, and his history of noncompliance with medication and
diet. (Tr. 16)  In making an RFC determination, the ALJ found
Rodriguez only marginally credible because his complaints of
urinary frequency or anger management problems were not reflected
in the evidence, there was no evidence of diabetic neuropathy or
a musculoskeletal condition that would prevent Rodriguez from
sitting, standing, or walking normally, and his vision was 20/20
in February 2002.  ALJ Wilkin also found that Rodriguez's lack of
compliance with his diabetic diet and medication regimen pre-
vented him from giving full weight to symptoms within his con-
trol, such as dizziness.  (Tr. 17)  He further concluded that
Rodriguez's wrist fracture was not debilitating in itself because
he continued to work for five years as a crane operator after the
injury, and he ceased work only when his employer closed. (Tr.
18)

     ALJ Wilkin next adopted the RFC suggested by Dr. Odeluga,
including his previous statements that Rodriguez could perform
light duty work, to find that Rodriguez could "lift/carry 10
pounds frequently and 20 pounds occasionally, and sit, stand
and/or walk 6 hours during an 8-hour day."  However, the ALJ
limited Rodriguez's work to simple, one or two-step jobs away
from heights or moving machinery because of his wrist pain and
Dr. Odeluga's commentary regarding loss of consciousness or
disorientation. (Tr. 18). At Step Five, the ALJ concluded that
Rodriguez could perform the jobs described by VE Grzesik in
response to his first hypothetical.

10

Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. ß405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting* *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also* *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability and supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable "to engage in any substantial gainful activity

11

by reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Secu-
rity regulations enumerate the five-step sequential evaluation to
be followed when determining whether a claimant has met the
burden of establishing disability.  20 C.F.R. §404.1520,
§416.920.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. §404.1520(b), §416.920(b).  If he is, the claimant is
not disabled and the evaluation process is over; if he is not,
the ALJ next addresses whether the claimant has a severe impair-
ment or combination of impairments which "significantly limits
. . . physical or mental ability to do basic work activities."
20 C.F.R. §404.1520(c), §416.920(c).  Third, the ALJ determines
whether that severe impairment meets any of the impairments
listed in the regulations.  20 C.F.R. §401, pt. 404, subpt. P,
app. 1.  If it does, then the impairment is acknowledged by the
Commissioner to be conclusively disabling.  However, if the
impairment does not so limit the claimant's remaining capabili-
ties, the ALJ reviews the claimant's "residual functional capac-
ity" and the physical and mental demands of his past work.  If,
at this fourth step, the claimant can perform his past relevant
work, he will be found not disabled. 20 C.F.R. §404.1520(e),
§416.920(e).  However, if the claimant shows that his impairment
is so severe that he is unable to engage in his past relevant

12

work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of his age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. ß423(d)(2); 20 C.F.R. ß404.1520(f), ß416.920(f).

Following the Appeals Councilís denial of review, the ALJís decision is the final decision of the Secretary. 20 C.F.R. ß404.981, ß416.1481. Therefore, the court will "only consider evidence that was before the ALJ." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  *See also* *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).

Rodriguez first contends that the ALJ erred in failing to consider his side effects of "chronic wrist pain, possibly due to post traumatic osteoarthritis, abnormal right range of motion, right handgrip weakness, possible right ulna neuropathy, severe, [sic] hypertension, and diabetes mellitus," which caused "dizziness, frequent urination, irritability and blurred vision" when he "found Plaintiff capable of performing the jobs of hand packer, mechanical assembler, and electrical assembler." (Pl. Opening Brief, pg. 11)  This argument, which is the same as the plaintiff's argument pertaining to the ALJ's burden at Step Five, must be rejected outright.

The ALJ explicitly incorporated right wrist pain and limited range of motion, right hand weakness, and the inability to work around heights and moving machinery due to disorientation or loss

13

of consciousness into the first hypothetical he posed to the VE.
Thus, the number and types of jobs proposed by the VE already
included these limitations.  Rodriguez's normal x-rays belie Dr.
Odeluga's initial impression of possible post-traumatic
osteoarthritis, which the doctor does not reference in his
subsequent treatment notes.  And, as more fully discussed below,
the record is devoid of any medical evidence supporting Rodri-
guez's claims of frequent urination or blurred vision beyond his
own testimony at the hearing.

Without any supporting authority, Rodriguez asserts that the
jobs the VE concluded Rodriguez could perform *with these limita-
tions* require him to use both hands frequently to reach, handle,
and finger.  First, "the ALJ was permitted to rely on the VE's
opinion, even if the VE contradicted the DOT." **Jens,** 347 F.3d at
213 (*citing* **Powers v. Apfel**, 207 F.3d 431, 436 (7th Cir. 2000)).
Second, Rodriguez was represented by counsel at the time of the
hearing, but he never challenged the VE's testimony.  Failure to
do so constitutes forfeiture of the issue.  *See* **Barrett v. Barn-
hart**, 355 F.3d 1065, 1067 (7th Cir. 2004); **Donahue v. Barnhart**,
279 F.3d 441, 446 (7th Cir. 2002); **Prochaska v. Barnhart**, ___
F.Supp.2d ___, 2005 WL 901202, at *14 (W.D. Wis. 2005). Third,
Dr. Odeluga repeatedly stated that Rodriguez was limited in
pushing, pulling, and how much he could carry with his right
hand, but that he could perform "light duty" work. (Tr. 97, 104-
06)  Finally, even if the ALJ had accepted that Rodriguez had a
total inability to use the right hand, the loss of use of an arm

14

or hand is not disabling per se. *See **Odle v. Secretary of Health
and Human Services***, 788 F.2d 1158, 1161 (6th Cir. 1985) (holding
that a person who has lost the use of an arm or hand can still
engage in substantial gainful activity).  The inclusion of the
right hand impairment in the hypotheticals posed to the VE demon-
strates that the ALJ did consider the limitation when determining
Rodriguezís ability to perform light work. Additionally, Rodri-
guezís own past work experience provides evidence that his right
hand impairment was not debilitating, as he worked for a number
of years after his accident and did not seek benefits until his
former employer closed the company.

    The plaintiff's last argument, that ALJ Wilkin made an
improper credibility finding by finding him only "marginally"
credible, fails but only because of the ALJ's failure to inquire
into the plaintiff's reasons for not complying with his pre-
scribed course of medical treatment.  The ALJ must determine
Rodriguez's credibility only after considering all of his symp-
toms "and the extent to which [his] symptoms can reasonably be
accepted as consistent with the objective medical evidence and
other evidence." 20 C.F.R. §404.1529(a).  If Rodriguez's impair-
ments reasonably could produce the symptoms of which he is
complaining, the ALJ next must evaluate the intensity and persis-
tence of the symptoms through consideration of his "medical
history, the medical signs and laboratory findings, and state-
ments from [his] treating or examining physician or psychologist,
or other persons about how [his] symptoms effect [him]." 20

15

C.F.R. §404.1529(c)(1).  If the symptoms Rodriguez describes are
not supported by the objective medical evidence, "the ALJ must
obtain detailed descriptions of [his] daily activities by direct-
ing specific inquiries" about the symptoms and their affect on
him. ***Clifford v. Apfel***, 227 F.3d 863, 871 (7th Cir. 2000) (*quot-
ing **Luna***, 22 F.3d at 691).  However, the ALJ "need not totally
accept or totally reject [Rodriguez's] statements." SSR 96-7p, at
*4.  Rather, the ALJ can make a determination based on the
totality of the evidence that Rodriguez's statements are only
credible to a certain degree. SSR 96-7p, at *4.

     While Rodriguez's complaints of disability cannot be based
on symptoms totally unfounded in medical findings, the ALJ may
not make a credibility determination "solely on the basis of
objective medical evidence." SSR 96-7p, at *1. *See also **Carradine
v. Barnhart***, 360 F.3d 751, 754 (7th Cir. 2004)("If pain is dis-
abling, the fact that its source is purely psychological does not
disentitle the applicant to benefits."); ***Indoranto v. Barnhart***,
374 F.3d 470, 474 (7th Cir. 2004). In addition, the ALJ must make
more than "a single, conclusory statement . . . The determination
or decision must contain specific reasons for the finding on
credibility, supported by the evidence in the case record, and
must be sufficiently specific to make clear to the individual and
to any subsequent reviewers the weight the adjudicator gave to
the individualís statements and the reasons for that weight." SSR
96-7p, at *2.  *See **Zurawski v. Halter***, 245 F.3d 881, 887 (7th
Cir. 2001); ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir. 1995)

(finding that the ALJ must articulate, at some minimum level, his analysis of the evidence).   The ALJ must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting* *Clifford*, 227 F.3d at 872).   The court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record.   *Jens*, 347 F.3d at 213; *Powers*, 207 F.3d at 435.   Furthermore, the ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

The ALJ discredited Rodriguez's credibility because the medical records did not reflect any complaints of urinary frequency or anger management problems, Rodriguez's vision was 20/20 as late as February 2002, and there was no evidence of diabetic neuropathy or a musculoskeletal condition.   Rodriguez states that the third rationale is "irrelevant," and so the court will not address it here.   (Pl. Opening Brief, pg. 15).

The substantial evidence supports the ALJ's finding regarding Rodriguez's diabetic symptoms in relation to his ability to work.   In contrast to Rodriguez's hearing testimony about vision loss, frequent urination, and the inability to sleep, Rodriguez's vision was 20/20 without correction only 16 months before the hearing. (Tr. 90).   He testified at the hearing that his vision

17

was getting worse and that he had glasses for seven months but
that the glasses were only for reading. (Tr. 168) He said that
without the glasses, his vision was "a little bit blurry." (Tr.
168) With regard to the polyurina, the medical evidence contains
no reference to complaints of, or treatment for, frequent urina-
tion. Although Rodriguez claimed at the hearing that Dr. Odeluga
recently had prescribed Flomax to control his urination and that
he urinated as much as 20 times a night, Dr. Odeluga's treatment
notes subsequent to the hearing do not reference the problem, and
the prescriptions in the record do not include any drug for
urinary control. (Tr. 132) The only sleep reference in Dr.
Odeluga's notes states that Rodriguez went to bed late but woke
up feeling refreshed. (Tr. 115). Finally, even with the wrist
pain, Dr. Odeluga twice stated that Rodriguez could perform light
work. (Tr. 97, 98)  In contrast to the plaintiff's allegation
that the ALJ failed to consider the factors set forth in SSR 96-
7p, the ALJ discussed all of the plaintiff's alleged symptoms at
the hearing and reasonably declined to give full credit to the
plaintiff's extreme allegations in light of the other evidence of
record, including the plaintiff's statements to Dr. Odeluga.

    The plaintiff's argument that the ALJ failed to account for
the plaintiff's mental limitations of anger, memory loss, and
difficulty concentrating essentially repeats the same criticism
of the ALJ's credibility determination set forth above, and it is
rejected for the same reasons.  Rodriguez never sought benefits
on the basis of mental problems. More importantly, the record

18

simply is devoid of any complaints or statements from Rodriguez, before or after the hearing, indicating that he has these problems, and he has not sought treatment for them. On this basis, the ALJ was fully reasonable to reject the plaintiff's allegations.

However, the ALJ's credibility determination cannot be upheld in totality because the ALJ failed to inquire into Rodriguez's reasons for not taking his medications or complying with his diabetic diet. As the ALJ duly notes in his credibility determination, the record is replete with statements that Rodriguez did not follow his prescribed diabetic diet or take his medications for hypertension and diabetes. (Tr. 94, 109, 111-112, 115)  In the context of a credibility determination, SSR 96-7p controls the court's analysis of a claimant's failure to follow prescribed treatment, rather than SSR 82-59.  *See* ***Conner v. Barnhart***, No. 1:04CV0469-JDT-TAB, 2005 WL 1939951, at *4 (S.D. Ind. 2005). According to this Ruling,

> the individual's statements may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.
>
> SSR 96-7p, at *7.

Prior to discounting a claimant's credibility on the issue of noncompliance, SSR 96-7p requires the ALJ to determine whether the claimant had a good reason for his failure by soliciting an explanation from the claimant. SSR 96-7p, at *7; **Conner**, 2005 WL 1939951, at *4; **Lovellette v. Barnhart**, No. 1:02-CV-273, 2003 WL 21918642, at *10 (N.D. Ind. 2003).

Here, Rodriguez appears to have seen Dr. Odeluga regularly and undergone all tests and x-rays prescribed by the doctor. While he now alleges that he lacked the financial resources to pay for his medication or follow his diet, there are no notes to that effect in the record, the plaintiff never claimed insufficient funds prior to or at the hearing, and he testified that a third party paid for all his medical care. (Tr. 158) Nevertheless, because the Seventh Circuit has strictly upheld the requirements of SSR 96-7p, including the duty to solicit an explanation for the plaintiff's noncompliance, the court is constrained to remand this case so that this inquiry can be made. **Conner**, 2005 WL 1939951, at *4.

For the foregoing reasons, the Motion for Summary Judgment or Remand filed by the plaintiff, Jovino Rodriguez, on February 4, 2005 is **GRANTED**. On limited remand, the ALJ should follow the inquiry requirement set forth by SSR 96-7p with respect to the plaintiff's noncompliance. The ALJ's decision is **AFFIRMED** in all other respects.

ENTERED this 31st day of January, 2006


                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge